UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

TRANS COMMODITIES, INC.,                        Civil Action No.

                 Plaintiff,

   v.                                       **COMPLAINT**

RASHID TEMIRBULATOVICH SARSENOV,
SOFIA TEMIRBULATOVNA SARSENOVA,
SERGEI ALIMOV, RAVIL SARATOV,
VALIKHAN KOSHUMBAYEV,
GULNARA SARBAGYSHEVNA,
CASPIAN PROGRESSIVE TECHNOLOGY, LTD.,
HELIOS LLP, AZS HELIOS LLC, and
JOINT STOCK COMPANY HELIOS,

                 Defendants.

-------------------------------------------------------------------x

Plaintiff, Trans Commodities, Inc. ("TCI"), by its attorneys, Kestenbaum, Dannenberg & Klein, LLP, as and for its Complaint in the above-entitled action, alleges as follows:

**ALLEGATIONS REGARDING THE
PARTIES, JURISDICTION AND VENUE**

1. TCI is a New York (U.S.) corporation with offices located in the City, County and State of New York.

2. Upon information and belief, defendant Rashid Temirbulatovich Sarsenov ("Sarsenov") is a resident and domiciliary of the Republic of Kazakhstan, residing at 5 Mitin Street in the City of Almaty.

3. Upon information and belief, Sofia Temirbulatovna Sarsenova is a resident and domiciliary of the Republic of Kazakhstan, residing at 39/23 Begalin Street in the City of Almaty.

4. Upon information and belief, defendant Sergei Alimov is a resident and domiciliary of the Republic of Kazakhstan, residing in the City of Almaty.

5. Upon information and belief, defendant Ravil Saratov is a resident and domiciliary of the Republic of Kazakhstan, residing in the City of Almaty.

6. Upon information and belief, defendant Valikhan Koshumbayev is a resident and domiciliary of the Republic of Kazakhstan, residing at in the City of Almaty.

7. Upon information and belief, defendant Gulnara Sarbagyshevna is a resident and domiciliary of the Republic of Kazakhstan, residing in the City of Almaty.

8. Upon information and belief, defendant Caspian Progressive Technology, Ltd. ("CPT") is a limited liability partnership chartered in Republic of Kazakhstan, City of Almaty, and having done business at 187A, Nursultan Nazarbayev Avenue 050013.

9. Upon information and belief, defendant Helios LLP is a limited liability partnership chartered and doing business in Republic of Kazakhstan, City of Almaty, at 69, Karasai Batyr str., 050000.

10. Upon information and belief, defendant AZS Helios LLC is a limited liability company chartered and doing business in Republic of Kazakhstan, City of Almaty, at 69, Karasai Batyr str., 050000.

11. Upon information and belief, defendant Joint Stock Company Helios is a joint stock company chartered and doing business in Republic of Kazakhstan, City of Almaty, at 69, Karasai Batyr str., 050000.

12. The matter in controversy in this action exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between a citizen of New York State and citizens or subjects of a foreign state.

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2).

14. Venue lies in this district, pursuant to 28 U.S.C. § 1391(b)(3).

15. Any objection to personal jurisdiction or venue in this Court is overcome by the fact, as described below, that defendants have used the judicial system in the Republic of Kazakhstan for criminal and corrupt reasons, as a result of which plaintiff would be unable to obtain a fair and impartial hearing of its claims in that country.

## ALLEGATIONS COMMON TO BOTH CLAIMS

### A.  *Background Facts Regarding Defendants' Business Operations*

16. The Republic of Kazakhstan ("Kazakhstan") was created in 1991 following the fall of the Soviet Union. As was the case with other former Soviet republics, independence in Kazakhstan was followed by the adoption of a policy of privatization of the country's commercial and industrial sectors, in which many individuals who had relationships with the country's new leadership received special treatment through ownership or control of privatized businesses.

17. Sarsenov was an example of how such special treatment was doled out. Through his relationship with Rakhat Aliyev, the then son-in-law of Kazakhstan's first and long-time President, Nursultan Nazarbayev, Sarsenov, a former philosophy teacher, became Deputy Minister of Education following the country's independence, a position that he parlayed into the

3

acquisition in 1993 of a controlling interest in "The French House," a business selling high-end perfume products.

18. Through his financial success with The French House, and again with the help of his political connections within the Nazarbayev Administration, Sarsenov obtained a seat on, and eventually became Chairman of, the Board of Directors of Central Asia Petroleum, Ltd. ("CAP"), a Kazakhstan company that, following privatization, acquired ownership of Kazakhstan Joint Stock Company "MangistauMunaiGas" ("MMG"), which produced approximately five million tons of oil per year. The MMG oil production (through a swap relationship with the Russian Federation, the details of which are not relevant to this action) was refined at Kazakhstan's Pavlodar Petrochemical Plant, which was owned and controlled by JSC "PNHZ," the subsidiary of a Kazakhstan joint stock company named JSC KazMunaiGas, and the gasoline from that refining process was sold through a network of gas stations located throughout the country.

19. During this period, Sarsenov became acquainted with two individuals: (a) Yuriy Midhatovich Ginatulin ("Ginatulin"), who served as General Director of PNHZ and a Manager for CAP; and (b) Ahmad Iqbal Saddique ("Saddique"), who was CAP's Vice President. Again through his connections within the Nazarbayev Administration, Sarsenov was able to arrange for a reorganization of the ownership of CAP, in which he became owner of 50% of the company's shares, with the remaining shares owned 25% each by Ginatulin and Saddique.

20. In about 1999, Sarsenov, Ginatulin and Saddique formed CPT, the shares of which (like with CAP) were owned 50% by Sarsenov and 25% each by Ginatulin and Saddique. Through CPT subsidiaries, including defendants Helios LLP, AZS Helios LLC, and Joint Stock Company Helios (hereinafter collectively referred to as the "Helios Defendants"),

4

Sarsenov, Ginatulin and Saddique engaged in the business of purchasing petroleum products from local refineries, and selling those products through a chain of company-owned "Helios" gas stations that account for a significant portion of the retail automobile fuel and lubricants market within Kazakhstan.

21. Beginning in about 2004, following a criminal investigation into Sarsenov's friend, Rakhat Aliyev (who was ultimately forced to leave the country), Sarsenov begin to withdraw from his position as a public owner and director of CAP and CPT, and he transferred ownership of his interest in both companies to his sister, defendant Sofia Temirbulatovna Sarsenova ("Ms. Sarsenova"), a professor at the Kazakh Academy of Sports and Tourism, although Sarsenov continued to control and the management of the companies and their subsidiaries, including the Helios Defendants, as well as to reap the financial benefits of ownership.

22. For individuals with power and influence within Kazakhstan, the use of bogus criminal charges, and the corresponding threat of arrest and imprisonment for unjustified reasons, can be used as a corrupt, but effective, tool for influencing or eliminating business rivals.

23. An example of this phenomenon occurred in about 2007, when, in furtherance of an illegal and corrupt plan to remove Ginatulin and Saddique from the ownership and management of CAP (and, through CAP, of MMG) and CPT (and, through CPT, of the Helios Defendants), Sarsenov surreptitiously used his influence within the Nazarbayev Administration to arrange for the filing of criminal charges against Ginatulin and Saddique based on allegations of improper tax filings made on behalf of PNHZ, the goal of which charges was to cause Ginatulin and Saddique to leave Kazakhstan out of a fear for their personal safety.

5

24. In reality, there was no basis for these allegations, but the fear that they might be arrested (however unjustifiably) did, in fact, cause Ginatulin and Saddique to leave the country as Sarsenov had planned. Once that occurred, Sarsenov arranged for his sister, Ms. Sarsenova, as the nominal owner of a 50% share of CPT, to bring a legal action in the Medeu District Court in Almaty, Kazakhstan, alleging that the ownership interest of each of Ginatulin and Saddique in CPT should be cancelled due to their not having contributed funds, proportionate to their ownership interests, for the capitalization of the company required by law. The total amount of such capitalization for CPT was approximately 150,000 Kazakhstan Tenge, which in 2006 was the equivalent of approximately 1,200 U.S. Dollars. Therefore, the share that would have been required by each of Ginatulin and Saddique to contribute, based on their 25% ownership interests, was $300.00. This was a negligible sum for a company like CPT, which at the time had annual revenue of approximately $800 million, and which had, in any event, easily covered the cost of those capitalization expenses directly.

25. Sarsenova predicted that, with Ginatulin and Saddique then residing outside the country, they would fail to respond to this legal action. Indeed, the Medeu District Court initially granted on default the application made on behalf of CPT, but Ginatulin and Saddique thereafter appeared through legal counsel and opposed the application. On reconsideration, the District Court denied the application as having no legal basis.

26. Subsequently, Ginatulin acquired Saddique's interest in CPT, whereupon Ginatulin became the holder of a 50% ownership interest in the company.

27. Thereafter, through his influence within the Nazarbayev Administration, and, by extension, within the upper echelons of the country's judiciary, Sarsenov was able to manipulate a corrupt Supervisory Board of the Supreme Court of Kazakhstan, on appeal, to issue

an order to reverse the District Court's ruling and to grant the application to remove Ginatulin as the registered owner of a 50% interest in CPT.

28. A written statement has been obtained, for use in this action, from Konstantin Vladimirovich Sviridov, who from 2003 to 2015 was the Director General of one or more of the Helios Defendants. In his statement, Mr. Sviridov describes how, in about June 2011, in order to cover up the illegal and corrupt scheme by Sarsenov to use his influence within the Kazakhstan judicial system to orchestrate a de facto seizure of the shares owned by Ginatulin in CPT, Sarsenov arranged for CPT to be dissolved, with ownership of its assets, including the ownership shares of the Helios Defendants, redistributed without consideration to four affiliated persons whom Sarsenov controlled, as follows: (a) 25% to defendant Sergei Alimov, a relative of Sarsenov and the Rector of Caspian Public University (with which Sarsenov was affiliated); (b) 25% to Ravil Saratov, another Sarsenov relative and the Director General of VITA Bottlers Kazakhstan LLP (a Sarsenov-controlled company that produces mineral water in the country); (c) 25% to Valikhan Koshumbayev, a professor at Caspian Public University (with which Sarsenov is affiliated) and who at one time was on the Board of Directors of PNHZ; and (d) 25% to Gulnara Sarbagyshevna, a colleague of Sarsenov from The French House business.

**B.**     *TCI's Loan to Ginatulin and Acquisition of a Security Interest in CPT*

29. On about July 1, 2006, with the knowledge of Sarsenov, TCI made a business loan to Ginatulin in the aggregate sum of One Hundred Million U.S. Dollars ($100,000,000.00) (the "Loan").

30. By Promissory Note executed in New York, dated as of July 1, 2006 (the "Note"), Ginatulin acknowledged his agreement to repay the Loan to TCI on demand, together with interest compounded annually at a rate of 15%.

31. In order to provide collateral security for the Loan, TCI and Ginatulin executed a Pledge Agreement in New York, dated as of July 1, 2006 (the "Pledge Agreement"), pursuant to which Mr. Ginatulin pledged to TCI his then 25% ownership interest in CPT. The security interest and lien created by the Pledge Agreement in that 25% interest was made with Sarsenov's knowledge and consent.

32. In accordance with the Pledge Agreement, any failure on the part of Ginatulin to repay the Loan, plus interest, to TCI under the terms and conditions set forth in the Note constituted an "event of default."

33. Also under the Pledge Agreement, upon the occurrence of such an "event of default," Ginatulin was obligated to transfer to TCI his 25% ownership interest in CPT, and to have that ownership interest registered in TCI's name.

34. When, as set forth in paragraph 26 above, Ginatulin acquired an additional 25% ownership interest in CPT through a transfer to him of the ownership interest that had previously been held by Saddique, Ginatulin became the owner of a 50% ownership interest in CPT (hereinafter referred to as the "Ginatulin CPT Shares").

35. By Amendment to Pledge Agreement executed in New York, dated as of October 23, 2010, TCI and Ginatulin agreed to modify the Pledge Agreement by, among other things, having Ginatulin add the additional 25% ownership interest in CPT that he had acquired from Saddique to Ginatulin's pledge to TCI, in consideration for which TCI agreed that, in the event of a default under the Note, Ginatulin would transfer, and TCI would accept, the Ginatulin CPT Shares as a remedy for any claim based on the Note, the Pledge Agreement, or the Amendment to the Pledge Agreement.

36. Also in the Amendment to Pledge Agreement, the parties agreed that, in the event of Ginatulin's failure to cure – that is, to pay principal and interest due under the Loan – within 30 days of his receipt of a notice of a default under the Note or the Pledge Agreement, Ginatulin would be obligated to turn over to TCI all of Ginatulin's interest in the Ginatulin CPT Shares.

37. The Note and the Pledge Agreement (and, by reference to the Pledge Agreement, the Amendment to Pledge Agreement) provided that any disputes between the parties be resolved by legal action in state or federal court in New York, NY (U.S.).

38. By letter personally delivered to Ginatulin on about July 1, 2018, TCI duly demanded repayment of the principal amount of the Loan, together with all outstanding interest, in accordance with the Note.

39. Notwithstanding the foregoing, no payment was thereafter made by Ginatulin to TCI of all or any part of the principal amount of the Loan, or of any interest or other amount due under the Note.

40. By letter personally delivered to Ginatulin on about August 1, 2018, Mr. Ginatulin was duly notified that he was in default under the Note, the Pledge Agreement, and the Amendment to Pledge Agreement, as a result of which Ginatulin became obligated to turn over to TCI all of Ginatulin's interest in the Ginatulin CPT Shares no later than August 31, 2018.

41. Notwithstanding the foregoing, Ginatulin failed to turn over to TCI his interest in Ginatulin's CPT Shares.

42. As a result, on November 1, 2018, TCI commenced an action against Ginatulin in the United States District Court for the Southern District of New York, entitled *Trans Commodities, Inc. v. Ginatulin*, Docket Number 18-civ-10177, which culminated in the

9

entry of a Judgment, dated December 17, 2018 (the "Judgment"), in TCI's favor, and against Ginatulin. Under the Judgment, the federal court declared that Ginatulin's 50% ownership interest in CPT was deemed transferred and turned over by Ginatulin to TCI, as a result of which TCI was declared to be the lawful owner of the Ginatulin CPT Shares.

### FIRST CLAIM FOR RELIEF
### (For Declaratory Judgment)

43. TCI repeats and realleges the allegations set forth in paragraphs 16 through 42 above as though more fully set forth herein.

44. By letters dated January 10, 2019, January 24, 2019, and February 22, 2019, TCI's counsel (a) notified Sarsenov, Ms. Sarsenova, CPT, and defendant Helios LLP of the entry of the Judgment, and (b) demanded that the equivalent of a 50% ownership interest in the shares of CPT be registered in TCI's name.

45. If defendants were unable to register CPT shares in TCI's name, due to the company's having been dissolved or for any other reason, then defendants had a responsibility in response to those demands to make a distribution to TCI of shares in the Helios Defendants, and all other assets owned by CPT at the time of its dissolution in 2011, having a value equivalent to a 50% ownership interest in the shares of CPT.

46. Notwithstanding the foregoing, no positive response was made by, or on behalf of, any of the defendants to TCI's demands.

47. As a result, TCI is entitled to a declaration that the shares of the Helios Defendants, and all other assets owned by CPT at the time of its dissolution in 2011, should be redistributed to TCI in proportion to a 50% ownership interest in CPT.

## SECOND CLAIM FOR RELIEF
(For Misappropriation of CPT's Assets
and Wrongful Undermining of TCI's Security Interest)

48. TCI repeats and realleges the allegations set forth in paragraphs 16 through 42 above as though more fully set forth herein.

49. Because of Sarsenov's illegal and corrupt schemes (a) to arrange for the filing of false criminal charges against Ginatulin, (b) to divest and misappropriate Ginatulin's CPT Shares, and (c) to dissolve CPT to cover up those schemes, TCI's security interest Ginatulin's CPT Shares, based upon the Pledge Agreement and the Amendment to Pledge Agreement, was undermined and, ultimately, destroyed.

50. The destruction of TCI's security interest in Ginatulin's CPT Shares resulted in TCI's being damaged in an amount equivalent to the Loan principal plus interest, in the aggregate amount of at least $600,000,000.00 (Six Hundred Million U.S. Dollars).

51. As a result, and in the alternative to the relief set forth in the First Claim for Relief above, TCI is entitled to money damages in the amount of no less than $600,000,000.00, the exact amount to be determined at trial.

## JURY DEMAND

52. TCI requests a trial by jury.

**WHEREFORE**, TCI respectfully demands judgment against defendants in this action, (i) granting a declaration that the shares of the Helios Defendants should be redistributed to TCI, as the current holder of the rights of all of Ginatulin's shares, in proportion to a 50% ownership interest in CPT, (ii) alternatively, for money damages in the amount of no less than

$600,000,000.00, the exact amount to be determined at trial, and (iii) for such other and further relief as to this Court may seem just and proper, including the costs and disbursements of this action.

Dated: April 30, 2019

        **KESTENBAUM, DANNENBERG & KLEIN, LLP**
        Attorneys for Plaintiff

        By: *Jeffrey C. Dannenberg*

        Jeffrey C. Dannenberg (JD-3270)

        260 Madison Avenue (17th Floor)
        New York, NY 10016
        (212) 486-3370
        Email: jdannenberg@kdklaw.com